Edward McALEER, Administrator of the Estate of James F. McAleer, Hardy Lebel and Joan Lebel, Administrators of the Estate of Thomas Lebel, Plaintiffs,

v.

Traver C. SMITH, Jr., Administrator of the Estate of Stuart A. Finlay, Mark Shirley Portal Litchfield, and Robin Patrick Cecil–Wright d/b/a the China Clipper Society, Goods Export Ltd. d/b/a the China Clipper Society, Berry Brothers and Rudd Ltd. d/b/a Cutty Sark, American Sail Training Association and Lloyds of London, Defendants.

Civ. A. No. 88–0544L.

United States District Court,
D. Rhode Island.

April 8, 1993.

See also 791 F.Supp. 923.

Edmund Pitts, Pitts & Pitts, Boston, MA, for plaintiffs.

Charles A. Lovell, Partridge, Snow & Hahn, Providence, RI, for defendant Traver C. Smith, Jr.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on motions by defendant Traver C. Smith, Administrator of the Estate of Stuart A. Finlay. First, defendant Smith moves to dismiss the complaint against him on the grounds that this Court lacks personal jurisdiction over him. Second, Smith moves for summary judgment on all counts of the complaint. For the reasons given below, defendant Smith's motion to dismiss is denied, but the motion for summary judgment is granted as to all counts of the complaint asserting claims against Smith's decedent, Finlay.[1]

### I. Background

This suit arises out of the sinking of the sailing vessel S/V MARQUES in June 1984 during the "Cutty Sark International Tall Ships Race" ("Tall Ships Race") from Bermuda to Halifax, Nova Scotia. Plaintiffs' decedents James F. McAleer and Thomas Lebel were sail trainees on the vessel who

---

1. Defendant Smith also moves to strike plaintiffs' jury trial demand. That motion is mooted by the Court's decision on the motion for summary judgment.

perished, along with Captain Stuart A. Finlay and a number of other crew members, in this tragic accident.

Plaintiffs' decedents were on board the MARQUES through an arrangement between the alleged owners of the vessel (Mark Litchfield and Robin Cecil–Wright d/b/a the China Clipper Society) and the American Sail Training Association ("ASTA"), a Newport based sailing association. Those aforementioned parties are also defendants in this action. Litchfield made an arrangement with ASTA whereby ASTA would solicit sail trainees and process their applications and payments for participation in the Tall Ships Race. ASTA assigned the trainees to the vessel and remitted payment to the China Clipper Society, retaining an amount to cover administrative expenses. ASTA also provided two counselors who were placed on board the MARQUES to supervise the trainees and serve as liaisons between the trainees and the captain of the ship.[2]

In return for their fee, the sail trainees were to be given the experience of working as crew members on the tall ship. They were assigned to the round-the-clock watch schedule in the same frequency and rotation as the regular crew members, and were listed on the MARQUES' "race list" as supplemental crew. As volunteers they were given some input into the particular duties they would perform, but generally the duties were those of the regular crew, including handling ropes and lines, furling sails, helping out in the galley and below decks and performing routine chores.

Defendant Smith's decedent Stuart A. Finlay was the captain of the MARQUES during its last voyage. As captain he had full operational control over the vessel while it was at sea. He had the right to direct and control plaintiffs' decedents in the performance of their duties, although the ASTA counselors served as intermediaries. Captain Finlay's arrangement with the owners of the vessel was governed by a "Captains Agreement" which provided that he was "self-employed." The Agreement also "asked and encouraged"

the captain to arrange business for the vessel, for which the captain would receive a percentage commission that varied with the value of the business. Captain Finlay was also a founding member of the Antiguan Maritime School, and expected to use the MARQUES later as a training ship for those students.

Captain Finlay drowned along with plaintiff's decedents when the MARQUES went down in a storm in June 1984. In March 1987 plaintiffs brought this suit as administrators of the estates of James F. McAleer and Thomas Lebel in the District Court for the District of Massachusetts against Traver C. Smith, alleged owners Mark ˙ Litchfield and Robin Cecil–Wright d/b/a the China Clipper Society, Goods Export Ltd. d/b/a the China Clipper Society, the sponsor of the race Berry Brothers and Rudd, Ltd. d/b/a Cutty Sark, ASTA, and Lloyds of London. Plaintiffs sought recovery under the Jones Act, 46 U.S.C.App. § 688, the general maritime law of negligence and unseaworthiness, and the Death on the High Seas Act, 46 U.S.C.App. §§ 761–68 for the personal injuries, conscious pain and suffering, and death of their decedents. (Plaintiffs' amended complaint also included several counts of deceit and breach of warranty against defendants other than Traver Smith.) The only defendants remaining in the case at this time are Litchfield, Cecil–Wright, ASTA and Smith. Goods Export was dismissed for lack of personal jurisdiction, Lloyds of London was granted summary judgment, and Berry Brothers settled.

Defendant Smith admits to being served with process on May 22, 1987, but he did not file an answer while the case was pending in the District of Massachusetts. On March 1, 1988, Judge Skinner of the District Court in Massachusetts declined to rule on motions to dismiss by defendants Litchfield, Cecil–Wright, Goods Export and Berry Brothers, and directed the parties to submit memoranda on whether the action should be transferred to the District of Rhode Island, a forum more likely to have personal jurisdic-

---

**2.** Further details of this arrangement are contained in the Court's first opinion in this matter,

*McAleer v. Smith,* 715 F.Supp. 1153 (D.R.I.1989).

tion over those parties. After a hearing, Judge Skinner entered an order dated September 7, 1988, transferring the case to this Court. Defendant Smith had not filed an answer at that time, and made no objection to the transfer.

Plaintiffs' motion for an entry of default against defendant Smith was granted by this Court on September 27, 1989. Almost two and a half years later, on March 19, 1992, Smith moved to remove the default and be granted permission to file a late answer. That motion was granted without hearing and without a showing of "good cause" under Fed.R.Civ.P. 55, because plaintiffs assented to the motion. Defendant Smith thus filed an answer and in it asserted that this Court lacked personal jurisdiction over him. On September 2, 1992 he filed the instant motions, asking that the complaint be dismissed for lack of personal jurisdiction, or in the alternative that he be granted summary judgment.

The parties engaged in oral argument on October 28, 1992 and the matter was taken under advisement. It is now in order for decision.

## II. Discussion

### A. Motion to Dismiss

Defendant Traver Smith moves to dismiss the complaint against him for lack of personal jurisdiction. He argues that neither he nor the decedent, Captain Finlay, have the necessary minimum contacts with Rhode Island to support this Court's jurisdiction under the Rhode Island long-arm statute or the Due Process Clause. Plaintiffs argue that this Court has jurisdiction over defendant because (1) jurisdiction in admiralty cases is nationwide; (2) defendant has consented to jurisdiction by appearing in this Court pro se; and (3) Captain Finlay was a partner or co-venturer with the owners of the MARQUES, and is therefore subject to jurisdiction for the acts of those agents in Rhode Island. The Court concludes that defendant Smith has waived his defense of lack of personal jurisdiction by his conduct in this case.

1. Standard for motion to dismiss

A federal court has personal jurisdiction over a defendant only where the defendant consents or is amenable to service of process under Rule 4 of the Federal Rules of Civil Procedure. The burden of establishing the court's jurisdiction rests on the plaintiff. 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure*, Civil 2d § 1351 at 248 (1990). Under Rule 4(e), governing service of process for a party not an inhabitant or found within the forum state, "a federal court normally looks either to a federal statute or to the long-arm statute of the state in which it sits to determine whether a defendant is amenable to service, a prerequisite to its exercise of personal jurisdiction." *Omni Capital International, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 105, 108 S.Ct. 404, 410, 98 L.Ed.2d 415 (1987).

There is no federal statute governing service of process in an in personam action in admiralty, so the Rhode Island long-arm statute governs jurisdiction in this action. That statute reaches to the full extent permitted under the Due Process Clause. *Conn v. ITT Aetna Finance Co.*, 105 R.I. 397, 252 A.2d 184 (1969). It provides that "every individual not a resident of this state or his executor or administrator ... that shall have the necessary minimum contacts with the state of Rhode Island, shall be subject to the jurisdiction of the state of Rhode Island ... in every case not contrary to the provisions of the constitution or laws of the United States." R.I.Gen.Laws § 9-5-33(a) (1985 Reenactment).

The requirements of the Due Process Clause were set forth by the Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The *International Shoe* analysis requires that a defendant have minimum contacts with the forum, so that the maintenance of a suit does not offend "traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. at 158. A court may have either specific or general jurisdiction over a defendant. If the defendant's contacts with the forum are limited, the court may have specific jurisdiction over the defendant, so that it may hear only those causes of

action that arise out of the defendant's contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). If the defendant has had continuous and systematic contacts with the forum state, the court has general jurisdiction over him, and may hear causes of action unrelated to the forum. *Id.* at 412, 104 S.Ct. at 1871.

Defendant asserts that neither he nor the decedent Captain Finlay maintained any of the contacts with Rhode Island described above. Defendant Traver Smith lives in Massachusetts and is a partner in a law firm there. He is not admitted to the Rhode Island bar and has represented clients in the state pro hac vice on only two or three occasions. He has had no contacts with the state in his capacity as administrator of Captain Finlay's estate. The decedent, Captain Finlay, had no contacts with the state of Rhode Island. He was a resident of Massachusetts at one time, but had married an Antiguan and was a resident of Antigua at the time of his death.

Plaintiffs do not argue that defendant Smith or the decedent Captain Finlay personally had the minimum contacts with Rhode Island necessary for this Court to exercise jurisdiction. Plaintiffs argue (1) that minimum contacts with Rhode Island are not necessary because jurisdiction in admiralty cases is nationwide; (2) that defendant has consented to jurisdiction by appearing pro se in this action; and (3) that Captain Finlay was subjected to this Court's jurisdiction by the actions of his partners or their agents within the state.

### 2. Admiralty

Plaintiffs argue that this Court has personal jurisdiction over defendant Smith because jurisdiction in a maritime case is nationwide, so that this Court has jurisdiction over any party that has the requisite contacts to satisfy the requirements of due process anywhere in the United States. Since defendant Smith has minimum contacts with the United States and clearly has notice of this action, plaintiffs assert that this Court has personal jurisdiction.

■ Plaintiffs' argument misstates the law. They correctly note that the Due Process Clause of the Fifth Amendment, as applied to federal question cases, requires only minimum contacts with the United States as a whole. *Omni Capital,* 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415; *Trans–Asiatic Oil Ltd. S.A. v. Apex Oil Co.,* 743 F.2d 956, 959 (1st Cir.1984); *Omni Video Games, Inc. v. Wing Co.,* 754 F.Supp. 261 (D.R.I.1991). However, the Due Process Clause is not the only restraint on a court's exercise of personal jurisdiction. A defendant must also be amenable to service of process. This is not simply a procedural requirement. "[B]efore a court may exercise personal jurisdiction over a defendant, there must be ... a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant." *Omni Capital,* 484 U.S. at 104, 108 S.Ct. at 409–10.

Thus, in federal question cases Congress has the power to provide for nationwide service of process without running afoul of the Due Process Clause. *See Omni Capital* at 106, 108 S.Ct. at 410–11. However, where Congress has not so provided, service of process is governed by Rule 4's direction to look to the long-arm statute of the state in which the court sits. Since there is no nationwide service of process in admiralty, this Court's reach in the area of personal jurisdiction is governed by the Rhode Island long-arm statute. That statute requires that a defendant have minimum contacts with the State before he is amenable to service of process.

### 3. Waiver

Plaintiffs argue that defendant Smith has waived the defense of lack of personal jurisdiction by answering and appearing pro se. Defendant argues that he has not waived the defense because he asserted it in his answer.

■ The lack of in personam jurisdiction is a defense that can be waived "by failure to assert it seasonably, by formal submission in a cause, or by submission through conduct." *Marcial Ucin, S.A. v. SS Galicia,* 723 F.2d 994, 996 (1st Cir.1983) (quoting *Neirbo Co. v. Bethlehem Corp.,* 308 U.S. 165, 168, 60 S.Ct.

153, 154–55, 84 L.Ed. 167 (1939)). Appearance in an action does not in itself constitute a waiver of the defense. 723 F.2d at 997. Rule 12(h) provides that the defense is waived if it is omitted from a motion to dismiss on other grounds, or "if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course." Fed.R.Civ.P. 12(h)(1)(B). Rule 12(h) does not require assertion of the defense within the twenty days allowed to serve a responsive pleading, but assertion of the defense must be timely or defendant will lose the defense through laches. 723 F.2d at 997.

Plaintiffs' argument that defendant's appearance pro se in this action waives his defense fails as a matter of law. Defendant filed an answer asserting the defense at the same time as his appearance. However, the Court concludes that defendant's delay in asserting the defense bars him from asserting it at this time.

■ It is well established that default may bar a party from asserting a defense of improper venue, another waiveable defense under Rule 12(h)(1). *Commercial Casualty Ins. Co. v. Consolidated Stone Co.*, 278 U.S. 177, 49 S.Ct. 98, 73 L.Ed. 252 (1929) (decided prior to enactment of the Federal Rules of Civil Procedure); *Zwerling v. New York & Cuba Mail S.S. Co.*, 33 F.Supp. 721 (E.D.N.Y.1940).

The same rule is not always applied to the defense of personal jurisdiction. Where there is no personal jurisdiction the defendant usually has not been properly served, and therefore the period of default never really began running. *Kadet–Kruger & Co. v. Celanese Corp. of America*, 216 F.Supp. 249, 250 (N.D.Ill.1963) ("defendants' motion not untimely" because "valid service has not yet been made"). *But see, Bavouset v. Shaw's of San Francisco*, 43 F.R.D. 296, 299 (S.D.Tex.1967) (motion to dismiss for lack of personal jurisdiction not timely, "[t]he fact that a court has allowed a party in default to proceed in the suit and answer the complaint does not automatically put the defaulting party in the position of one who is making a timely response to a complaint"). Even in

such cases, conduct by the defendant may cause him to submit to jurisdiction. *Marcial Ucin*, 723 F.2d at 997 (defendant who appeared and took part in depositions but did not file a motion or responsive pleading for four years waived the defense of lack of personal jurisdiction).

■ In this case, valid service was made on the defendant on May 22, 1987, when the action was pending in Massachusetts. Defendant Smith did not object to the jurisdiction of the District Court in Rhode Island when transfer was being considered, nor did he object in the first *four years* that the action was pending in this Court. Smith's assertion of lack of personal jurisdiction at this stage would result in the very type of unnecessary delay that Rule 12 was intended to prevent. The Court concludes that Smith's conduct in this case has been "sufficiently dilatory and inconsistent with [his] assertion of lack of in personam jurisdiction to constitute a waiver of the defense." 723 F.2d at 997.

### 4. Conclusion

Defendant Smith has waived his defense of lack of personal jurisdiction by failing to assert it in a timely manner. The Court therefore will not address plaintiffs' contention that the actions of other defendants submitted defendant Smith to the jurisdiction of this Court.

### B. Motion for Summary Judgment

Defendant Smith has moved for summary judgment on plaintiffs' claims under the Jones Act, 46 U.S.C.App. § 688, the general maritime law of unseaworthiness and negligence, and the Death on the High Seas Act, 46 U.S.C.App. §§ 761–62, on various grounds that will be hereafter discussed.

■ Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law.

In determining whether summary judgment is appropriate, the court must view the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Additionally, the moving party bears the burden of showing that no evidence supports the non-moving party's position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

### 1. The Jones Act

Defendant Smith moves for summary judgment on the Jones Act claims, Counts I–IV of the complaint, contending that Captain Finlay was not the employer of plaintiffs' decedents, and therefore cannot be made liable under the Jones Act. Plaintiffs argue that Finlay exercised such control over the operations of the vessel that he should be considered an owner pro hac vice, and therefore an employer. They also argue that Finlay was a partner or co-venturer with the shipowners, and for that reason is an employer.

The Jones Act provides that "any seaman who shall suffer personal injury in the course of employment may maintain an action for damages at law...." 46 U.S.C.App. § 688 (1988). The statute has been interpreted to require that a Jones Act defendant be the employer of the seaman. *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 791, 69 S.Ct. 1317, 1321–22, 93 L.Ed. 1692 (1949). For the purposes of this motion neither party has disputed the status of plaintiffs' decedents as seamen under the statute.

The "employer" of a seaman on a vessel is ordinarily the owner of the vessel, *Matute v. Lloyd Bermuda Lines Ltd.*, 931 F.2d 231, 236 (3d Cir.1991), but may under some circumstances be another party. The existence of an employer-employee relationship "turns on the degree of control exercised over the crewman. Factors indicating control over the seaman include payment, direction or supervision. Also relevant is the source of the power to hire and fire." *Id.; see also*

*Mahramas v. American Export Isbrandtsen Lines, Inc.*, 475 F.2d 165, 171 (2d Cir.1973) ("the right of control is one of the most important factors to consider").

The master of a vessel generally exercises many of these powers of control. *See Stevens v. Seacoast Co.*, 414 F.2d 1032, 1035 (5th Cir.1969) (traditionally ship's master hires and fires the crew, as well as operates, navigates and controls vessel once underway). However, when the master acts purely as the owner's agent, he is not an employer within the meaning of the Jones Act. *Kennedy v. Gulf Crews, Inc.*, 750 F.Supp. 214, 215–16 (W.D.La.1990). Plaintiffs argue that in this case the master was an employer, because he was acting as an "owner pro hac vice" or was a partner or co-venturer with the shipowners.

■ The doctrine of liability as owner pro hac vice arises from situations where an owner has made a "bareboat" or "demise" charter to another party. *Reed v. The Yaka*, 373 U.S. 410, 412, 83 S.Ct. 1349, 1351–52, 10 L.Ed.2d 448 (1963). As the United States Supreme Court has described it, "[u]nder such arrangements full possession and control of the vessel are delivered up to the charterer for a period of time. The ship is then directed by [the charterer's] master and manned by his crew; it makes his voyages and carries the cargo he chooses. Services performed on board the ship are primarily for his benefit." *Id.* Under this doctrine the actual owner of the vessel is generally shielded from liability as an owner of the vessel, because he has relinquished all control over the vessel to another person, albeit temporarily. *Deal v. A.P. Bell Fish Co.*, 674 F.2d 438, 440–41 (5th Cir.1982).

Under some circumstances the master of a vessel may be an owner pro hac vice. Courts have addressed this issue in the context of so-called "fishing lays," where a fishing vessel is operated under an agreement, or "lay," for sharing the proceeds of the catch. In *Cromwell v. Slaney*, 65 F.2d 940 (1st Cir. 1933), the First Circuit held that where a master employed the crew and controlled all operations of a vessel, the owner of the vessel took a straight percentage of the gross receipts and the captain and crew split the

profits after paying all expenses, the master was an owner pro hac vice and the ship owner was not liable under the Jones Act. *Id.*

The Fifth Circuit has applied a more restrictive standard for showing that a master is acting as owner pro hac vice, holding that where the arrangement is of indefinite tenure and revocable at the will of the owner, the fishing lay amounts to no more than a method for determining fair compensation for the master and crew. *Stevens v. Seacoast Co.*, 414 F.2d at 1036. *See also Deal*, 674 F.2d 438 (where agreement provided no set duration and ship repairs were charged to shipowner, owner, not master, was employer of crewman).

■■■■ It is not necessary for the Court to ascertain which of these standards should be applied in determining owner pro hac vice status, because it is clear that under any standard Captain Finlay was not acting as such. Captain Finlay was indeed in full control of the operation of the vessel, but that control was being exercised on behalf of the owners of the ship, not on the Captain's own behalf. First, there is no allegation that Captain Finlay took any share in the profits from the vessel's participation in the Tall Ships Race or the arrangement with the ASTA sail trainees. Plaintiffs make much of the fact that Captain Finlay was able to make a commission on business he brought to the vessel. However, payment of a commission is not an indication of owner pro hac vice status, where that commission is unrelated to actual profits. Here Captain Finlay was able to receive a straight percentage of the value of the business, regardless of whether the undertaking was profitable. Furthermore, there is no allegation that Captain Finlay received such a commission in relation to the Tall Ships Race or the sail trainee arrangement.

Second, the undisputed facts show that all expenses of the MARQUES were to be paid by the owners of the vessel. The "Agreement for Captains" states that captains were to be issued credit cards for paying expenses in the United States. Captains were expected to negotiate for supplies free of charge (for "a good cause") whenever possible, but the expenses incurred were ultimately borne by the owners. According to the Agreement, even expenses incurred by captains in finding business were borne by the owners.

Finally, the facts are undisputed that Captain Finlay had no part in hiring these sail trainees. Plaintiffs point to the fact that Captain Finlay was a founding member of the Antiguan Maritime School, presumably in an attempt to raise an inference that Captain Finlay had some active part in arranging sail training. However, there is no evidence or even allegation that Captain Finlay was in any way involved with the arrangement with the ASTA sail trainees. The undisputed facts clearly indicate that Captain Finlay was not acting as owner pro hac vice of the MARQUES.

■■■ Plaintiffs make a second argument for holding Captain Finlay liable as an employer, i.e. that he was a partner or co-venturer with owners Litchfield and Cecil–Wright in the operation of the MARQUES. A partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit." R.I.Gen.Laws § 7–12–17 (1992 Reenactment).[3] The primary factors relevant to determining the existence of a partnership is the sharing of profits. *See* R.I.Gen.Laws § 7–12–18 (1992 Reenactment) (receipt of share of profits is prima facie evidence of partnership).

Under this standard, the undisputed facts reveal that Captain Finlay was not in partnership with the owners of the MARQUES. He had no ownership interest in the vessel; he did not share in the profits from the vessel's operations; and he had no control over the vessel's itinerary beyond the operational control necessarily assumed by a captain. The marketing and commission arrangement relied on by plaintiffs raises no inference of a partnership.

Since Captain Finlay was neither an owner pro hac vice nor partner with the owners of

---

3. Although this definition is under Rhode Island law, it expresses a general principle of partnership that is accepted in admiralty.

the MARQUES, he may not be held liable under the Jones Act as the employer of plaintiffs' decedents. Summary judgment for defendant Smith on the Jones Act claim is thus appropriate.

### 2. Unseaworthiness

Defendant Smith has moved for summary judgment on plaintiffs claim for unseaworthiness, Counts V and VI of the complaint, on the grounds that Captain Finlay was not an owner of the vessel. Plaintiffs argue that Finlay can be held liable for the unseaworthiness of the vessel on the same basis as they argued under the Jones Act: that Captain Finlay was an owner pro hac vice or partner/co-venturer with the owners of the MARQUES.

Admiralty has long recognized the duty of a shipowner to provide a seaworthy vessel. That duty is "peculiarly and exclusively the obligation of the owner. It is one he cannot delegate." *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 101, 66 S.Ct. 872, 880, 90 L.Ed. 1099 (1946).

Plaintiffs' arguments fail in this context for the same reasons as stated with regard to the Jones Act claims. Captain Finlay was not an owner pro hac vice of the MARQUES or a partner or co-venturer with the owners. He had no ownership interest in the vessel, did not share in the profits from the vessel's operations, and did not control the vessel's itinerary. Therefore, defendant Smith is entitled to summary judgment on the unseaworthiness claims.

### 3. Negligence

Counts VII and VIII of plaintiffs' complaint seek recovery under the general maritime law of negligence. Defendant Smith argues that this claim is barred by the fellow servant rule. Plaintiffs argue that Congress abolished the fellow servant rule against superior officers by statutory enactment, citing the "LaFollette Seamen's Act of 1915," which provided: "In any suit to recover damages for any injury sustained on board a vessel or in its service seamen having command shall not be held to be fellow-servants with those under their authority."

Plaintiffs here attempt to proceed under a general maritime cause of action for negligence. It is clear that maritime law does provide a cause of action for negligence. *Cerqueira v. Cerqueira,* 828 F.2d 863, 866 (1st Cir.1987); *Mahramas,* 475 F.2d at 169. However, the status of such an action against a master of a vessel is unclear. Upon review of the history of seamen's actions, the Court concludes that there is no negligence cause of action against the captain of a vessel.

The history of a seamen's recovery for injuries incurred through the negligence of his master or fellow crewmen begins with the Supreme Court's decision in *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). In *The Osceola,* the Court held that a seamen could not recover a full indemnity from the owner for injuries he suffered due to the negligence of the master. In so holding the Court stated:

[W]e think the law may be considered as settled upon the following propositions:

1. That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued.

2. That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship.

3. That all the members of the crew, except perhaps the master, are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew beyond the expense of their maintenance and cure.

4. That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew, but is entitled to maintenance and cure, whether the injuries were received by negligence or accident.

189 U.S. at 175, 23 S.Ct. at 487 (citations omitted). The Court's opinion left open the

question of whether a master was indeed a fellow servant to his crew members, although this was one of the three certified questions presented to the Court. In reviewing the authorities on the issue, the Court noted that in England the master and crew were treated as fellow servants, but that the rule was otherwise in Ireland and Scotland, where the master was regarded as vice principal. *Id.* at 171–72, 23 S.Ct. at 485–86. However, the Court found it unnecessary to decide the issue, because regardless of the fellow servant rule the owner's liability for negligence was limited to maintenance and cure.

This aspect of the Court's opinion was perhaps not as clear as it might have been; in any case, it appears that Congress misunderstood the Court's holding. In 1915 Congress enacted a statute sometimes referred to as the "LaFollette Act," Section 20 of which provided: "In any suit to recover damages for any injury sustained on board vessel or in its service seamen having command shall not be held to be fellow-servants with those under their authority." *See* 46 U.S.C.A.App. § 688 Historical Note (1975). Congress apparently intended to change the maritime law as enunciated in *The Osceola.* Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty,* at 325 (1975) ("At least, if that was not the intention, no one has ever been able to suggest what the intention was.").

The LaFollette Act did not have the desired effect. In *Chelentis v. Luckenbach S.S. Co.,* 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918), the Supreme Court held that in a fact situation substantively identical to that of *The Osceola* (seaman's injury caused by master's negligent order), Section 20 of the LaFollette Act was "irrelevant," and the seamen still had no recovery beyond that of maintenance and cure. 247 U.S. at 384, 38 S.Ct. at 503–04. The Court stated that "the maritime law imposes upon a shipowner liability to a member of the crew injured at sea by reason of another member's negligence without regard to their relationship." *Id.* As the Court read the statute, it "disclose[d] no intention to impose upon shipowners the same measure of liability for injuries suffered by the crew while at sea as the common law prescribes for employers in respect of their

employees on shore." *Id.* at 384–85, 38 S.Ct. at 503–04.

In the wake of *Chelentis* Congress was finally able to enact a statute having the desired effect of giving a seaman full recovery against his employer for the negligence of the master or crew. In 1920 it amended the LaFollette Act to the language of the Jones Act, in Section 33 of the Merchant Marine Act of 1920. It provides:

Any seaman who shall suffer personal injury in the course of his employment may ... maintain an action for damages ... and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railroad employees shall apply.

46 U.S.C.App. § 688 (1988). The Jones Act referred to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq. (1988), which provides: "Every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ...," § 51, and, inter alia, abolishes the defense of assumption of risk, § 54, and provides that contributory negligence will reduce, but not bar recovery, § 53. In accord with the FELA, the Jones Act has been read to provide a cause of action only against the employer of a seaman. *Cosmopolitan Shipping Co. v. McAllister,* 337 U.S. at 791, 69 S.Ct. at 1321–22.

The history of seamen's actions against their employers provides a somewhat confusing backdrop for consideration of actions against the master of the vessel. The primary source of this confusion is the language of the Supreme Court in *The Osceola,* stating that "all the members of the crew, except perhaps the master, are, as between themselves, fellow servants." This language misled Congress into enacting the LaFollette Act, and has led some to argue that the master should be considered as something other than a fellow servant to his crew members.

The Court believes this confusion is unnecessary. It was well settled in English law at the time *The Osceola* was decided that the master and crew were fellow servants, and

the master was not personally liable to crew members for negligence. *The Osceola,* 189 U.S. at 171, 23 S.Ct. at 485. Although the Supreme Court suggested that Irish and Scottish law held otherwise, *id.,* this Court has been able to find no American case in which a master has been held personally liable for negligently injuring a crew member.[4] The only court that has ruled on the issue is the District Court for the Western District of Louisiana, which held that the master could not be held personally liable to a crew member for negligence. *Kennedy v. Gulf Crews, Inc.,* 750 F.Supp. 214 (W.D.La. 1990). This Court finds certain of the reasoning of *The Osceola* persuasive: "Considering the frequency of such accidents, . . . the absence of any authority holding [this party] liable . . . is evidence of the strongest character that no further liability under the maritime law exists." 189 U.S. at 173, 23 S.Ct. at 486.

This rule has not been abolished by statutory enactment, as contended by plaintiffs. The LaFollete Act relied upon was superseded in 1920 when the Jones Act was enacted. The Jones Act clearly provides a cause of action only against the employer of the seaman. Outside the ambit of the Jones Act, general maritime law still applies, and maritime law does not allow actions for negligence against fellow servants, including superior officers.

The Court is convinced of the justness of this result. Assessing liability against employers places the burden of employment related injuries on the party most able to insure against the risk. Unlike the employer, a master would find it extremely difficult to insure against injuries to crew members for each voyage he undertakes. By placing liability on the shoulders of the employer, Congress has made a commercially reasonable allocation of risks, one that this Court will not disturb.

### 4. The Death on the High Seas Act

Finally, defendant Smith moves to dismiss plaintiffs' claims under the Death on the High Seas Act ("DOHSA"), 46 U.S.C. App. § 761 (1988). That statute provides:

> Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas . . . the personal representative of the decedent may maintain a suit for damages . . . for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

The parties arguments focussed on whether these plaintiffs have the type of "pecuniary loss" which is the only recovery allowed under DOHSA. 46 U.S.C. App. § 762. However, the rejection of plaintiffs' other causes of action raises the question of whether any cause of action survives under DOHSA itself.

DOHSA provides a cause of action only against parties "which would have been liable if death had not ensued." 46 U.S.C. App. § 761. DOHSA does not create any substantive rights; "[s]ince DOHSA merely authorizes an admiralty action, a party proceeding under DOHSA must allege a theory of recovery cognizable by a court sitting in admiralty jurisdiction." *Best v. Honeywell, Inc.,* 491 F.Supp. 269 (D.Conn.1980), *aff'd sub nom Best v. Sikorsky Aircraft,* 679 F.2d 872 and *aff'd,* 679 F.2d 874 (2d Cir.1982) (holding that breach of warranty theory is not cognizable under DOHSA). *See also Noel v. United Aircraft Corp.,* 204 F.Supp. 929 (D.Del.1962) (same).

In this case plaintiffs have alleged three theories of recovery against this defendant: the Jones Act, unseaworthiness, and general negligence. The Jones Act provides its own remedy for a deceased seaman independent of DOHSA, and in any case only against an employer, which Finlay was not. Also Finlay's estate cannot be made liable on the theories of unseaworthiness and general negligence, as has already been explained. Therefore, the Court fails to see any basis

---

**4.** *The Osceola* cited cases in which a master was held liable for an intentional tort, *see The Osceola* at 171, 23 S.Ct. at 485 (citing *The Agincourt,* 1 Hagg. Adm. 271; *The Lowther Castle,* 1 Hagg. Adm. 384), but this has no bearing on the fellow servant rule issue. Even a fellow crewmember may be held liable for intentional torts. *Pearson v. Rowan Cos.,* 674 F.Supp. 558 (E.D.La.1987).

under which Captain Finlay or his estate "would have been liable" to plaintiffs' decedents if they were still living. Defendant Smith is therefore entitled to summary judgment on the DOHSA claims, Counts IX and X of the complaint.

### III. Conclusion

For the reasons stated above, defendant Smith's motion to dismiss is hereby denied, but his motion for summary judgment on all claims made against him is hereby granted. No judgment will enter until all claims in this case have been resolved.

It is so ordered.